UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CASE NO. 1:14-cr-35-CLC-WBC |
| vs. ) | |
| ) | |
| AARON SUTTLES ) | |

REPORT and RECOMMENDATION

I. Introduction

On the evening of December 31, 2013, police attempted to speak with defendant Aaron Suttles who was sitting outside in one of the housing projects of Chattanooga, Tennessee. As they approached the defendant, he ran and a foot chase ensued resulting in defendant's eventual seizure after which police recovered a gun and drug contraband. Defendant, who is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), now moves to suppress all evidence, including statements, obtained as a result of a search and questioning following his detention [Doc. 13]. This matter is before the undersigned Magistrate Judge having been referred for a report and recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons stated herein, it is RECOMMENDED defendant's motion to suppress be DENIED.

II. Facts

Sgt. Kevin Trussell and Officer Kelly Downs of the Chattanooga Police Department (CPD) testified at the evidentiary hearing on August 14, 2014. Both Sgt. Trussell and Officer Downs are assigned to the CPD's 17 person Crime Suppression Unit which focuses on drugs and violent crimes related to gang activity. Trussell has been with CPD for 12 years and assigned to

1

the Crime Suppression Unit for 6 years. Downs has been with the Crime Suppression Unit since she started with the CPD two and a half years ago.

On New Year's Eve in 2013, Trussell, Downs, and at least two other patrol officers with CPD set out on foot patrol inside the College Hill Courts housing project on the westside of Chattanooga, Tennessee. The officers were wearing tactical gear with "police" written across the front. College Hill Courts is known to be a high crime area with a significant gang presence, and the CPD tries to send officers into College Hill Courts every day. During the evidentiary hearing, the government presented a CPD computer printout showing that approximately 600 calls were made by police to College Hill Courts from January 2012 to July 2014. (*See* Gov. Ex. 1.) Reasons for the calls ranged from trespass, vandalism, car theft, and simple assault to weapons violations, rape, aggravated assault, and drug charges. *Id.* Of these 600 calls, 126 were for drug violations. (*See* Gov. Ex. 2.) In years past, the CPD had noticed "an abundance of shots fired" on New Year's Eve, and the foot patrol was undertaken in an effort to proactively discourage this gun activity.

The police officers were walking down Cypress Street when they saw two men about 20 to 30 yards away sitting together outside talking and looking around. One was wearing coveralls and the other was wearing a red T-shirt. Trussell testified he goes to College Hill Courts "all the time," and he did not know either of the men, a fact which made him suspicious. That one of the men was wearing coveralls also made Trussell suspicious because he knew contraband could be hidden easily inside the coveralls.

Downs testified that while she did not see an actual exchange of anything, she saw the two men "come together" which made her suspicious that a drug transaction had occurred.

2

When the men saw the officers, they split up and started walking away in opposite directions, another fact which Trussell testified made him suspicious.

The man in the red t-shirt walked up to the porch of a near-by residence and went inside. Trussell followed him to the door. Downs asked the person in the coveralls, the defendant, to "come here." At this request, defendant took off running. Downs and all the officers including Trussell began to chase the defendant. Downs was yelling, "stop running, stop running." Downs testified that as the defendant ran, she saw him clutch his coveralls at his waist, conduct which made her think he might have a gun hidden in his coveralls. She also testified she saw him reach inside his coveralls and then run around the corner of a building where she could no longer see him. On cross examination, Downs admitted that when she prepared an affidavit of complaint for the incident, she did not include in the affidavit that she saw the defendant clutching at or reaching inside his coveralls.[1]

Downs, who had drawn her taser, was the first officer to make it around the corner of the building, and she saw that defendant had stopped running. She waited for the other officers to catch-up before placing him "in custody." The officers placed defendant on the ground and handcuffed him because, she testified, he was a flight risk. Downs estimated they had chased defendant about 300 yards. Trussell left to backtrack the route on which they had chased the defendant to see if he had thrown anything down while he was running, but Trussell found nothing.

Immediately after placing defendant on the ground, Downs asked defendant, "do you have anything on you?" Downs testified at the hearing she was trying to determine if he had a

---

[1] Despite this omission of defendant's clutching at the coveralls from the affidavit, the undersigned finds Downs' testimony to be credible. Written reports are frequently not as detailed as an oral narrative of events, and I observed Downs' demeanor during her testimony and found her to be credible.

gun, any other weapon, and other items like a syringe with a needle that could pose a hazard to the officers. Defendant responded that he had some marijuana and crack cocaine. He also told Downs his name. The officers searched the defendant and did not find a weapon though they did recover some small bags of marijuana and a small bag of crack cocaine in the pockets of his coveralls. Officers then searched the immediately surrounding area and found a gun 15 to 10 feet away from the spot where they had apprehended the defendant.

After officers secured the gun, defendant was allowed to sit on a stairwell of a nearby building. One of officers gave the defendant his *Miranda* rights and then another officer questioned him about the gun. While in the patrol car in route to the police station, defendant admitted the gun was his and that he had sold $10.00 worth of marijuana to the man in the red t-shirt. He also stated he had the gun because everyone has a gun on New Year's Eve, and he needed it for protection.

Before defendant was transported to the police station, Downs was informed that another officer had checked and learned defendant was on the "No Trespass" list of the Chattanooga Housing Authority (CHA). The CHA owns the College Hill Court housing project and maintains a list of persons that it has, based on criminal histories, decided will not be allowed on the premises. If someone is placed on the "No Trespass" list, he is given notice that he is on the list, that he is not allowed on the premises, and that he is subject to arrest if he does trespass on the property.

### III. Analysis

The Fourth Amendment protects citizens against unreasonable searches and seizures of their persons, homes, and property. U.S. Const. Amend IV. As a general rule, evidence obtained in violation of a person's Fourth Amendment rights must be excluded as evidence in a criminal

4

case brought against that person. *David v. United States*, 131 U.S. S.Ct. 2419, 2423 (2011); *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 363 (1998); *Elkins v. United States*, 364 U.S. 206, 217 (1960). It is defendant's contention that the gun, the drugs, and his statements were obtained by police as a result of his detention which violated his Fourth Amendment rights; therefore, the argument continues, this evidence must be suppressed.

Before I begin an analysis of the legality under the Fourth Amendment of defendant's detention, I will first address the legality of the gun's seizure which does not implicate the Fourth Amendment.

### *A. The Firearm*

In *California v. Hodari D.*, 499 U.S. 621 (1991), the Supreme Court held an officer's chasing Hodari D. while demanding he stop did not constitute a detention. *Id.* at 625-629. Rather, Hodari D. was detained within the meaning of the Fourth Amendment only when the officer tackled him. *Id.* at 629. The Supreme Court clarified that merely demanding a fleeing person stop, without that person's submission to the show of authority, does not constitute a seizure. *Id.* at 625-629. In sum, "[t]here can be no arrest without either touching or submission." *Id*. at 626-27; *see also United States v. Martin*, 399 F.3d 750, 752 (6th Cir. 2005) (holding that *Hodari D.* established the rule that "when a suspect refuses to submit to a show of authority by the police, the suspect is not seized by the police until such time as he or she submits or is forced to submit to police authority.") Further, the Supreme Court in *Hodari D.* also held that when a person discards an item while running away from police, he has *abandoned* it and no longer has any Fourth Amendment protections in that item. *See Hodari D.*, 499 U.S. 628-29 (holding that when Hodari D. threw onto the ground a rock of crack cocaine during a foot chase with police immediately before he was tackled, he abandoned the rock of crack cocaine and his motion to

5

suppress was properly denied) (citing *Hester v. United States*, 265 U.S. 57 (1924) (holding no seizure within the Fourth Amendment occurred when revenue agents picked up and examined containers dropped by moonshiners during a pursuit by revenuers because the moonshiners abandoned the containers when they dropped them.)) *See also*, *United States v. Nelson*, 725 F.3d 615, 622 (6th Cir. 2013) (defendant who threw gun into bushes during police chase abandoned it and thus had no legitimate expectation of privacy in it and, concomitantly, no basis to assert a violation of his Fourth Amendment rights for its warrantless seizure); *Martin*, 399 F.3d at 752-53 (defendant abandoned revolver when he dropped it while being chased by police, and thus motion to suppress was properly denied.)

In the instant case, the evidence indicates that when the defendant ran around the corner of the building rendering him momentarily out of sight of the pursuing police, he discarded the gun thereby abandoning it before he stopped running, submitted to police authority, and was seized. Consequently, in relation to the gun, he has no interest which is protected by the Fourth Amendment, and the undersigned will recommend the motion to suppress as to the gun be denied.

### B. The Drugs and Defendant's Statements

Defendant's motion to suppress related to the drugs and the statements require a separate analysis focused on the legality of his detention.

There are three types of permissible encounters between police and citizens:

> (1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause.

*United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000) (quoting *United States v. Avery*, 137 F.3d 343, 352 (6th Cir.1997)); *accord United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008).

6

This analysis concerns the last two types of encounters which constitute detentions within the meaning of the Fourth Amendment. *See id.* As previously discussed, when the defendant submitted to Downs' demands that he stop running, defendant was detained within the meaning of the Fourth Amendment, and, unless Downs had a reasonable basis to detain defendant, the detention would violate his Fourth Amendment rights thereby necessitating exclusion of any evidence obtained as a result of the illegal detention. *See United States v. Johnson*, 620 F.3d 685 (6th Cir. 2010) ("If a stop is not justified at its inception, any evidence resulting therefrom must be excluded.") (citing *United States v. Blair*, 524 F.3d 740, 750 (6th Cir. 2008)).

Specifically, defendant argues that when he stopped running and submitted to police authority, he was subjected to an investigatory stop for which police had no articulable, reasonable suspicion. Defendant further argues that when he was placed on the ground and cuffed, the stop ripened into an arrest and police had no probable cause to arrest him. Therefore, the argument continues, "all evidence, including any and all statements" were obtained as a result of the illegal detention and must be suppressed. (Defendant's brief at 6, Doc. 13, Page ID # 26).

It is the government's position that defendant was initially stopped for investigative purposes only and that police had reasonable suspicion to justify the investigatory stop. Further, the government asserts, defendant was arrested only after police had knowledge that he was carrying illegal drugs thereby giving police probable cause to arrest him.

Police officers may briefly detain an individual for investigative purposes if they have an articulable, reasonable suspicion that the person has committed a crime. *Terry v. Ohio,* 392 U.S. 1 (1968), *Loza v. Mitchell*, __F.3d __, 2014 WL 4403111 *6 (Sept. 2, 2014); *Houston v. Clark Cty Sheriff Deputy John Does 1-5,* 174 F.3d 809, 813 (6th Cir.1999). "In evaluating the

7

constitutionality of a *Terry* stop, [courts] engage in a two-part analysis of the reasonableness of the stop." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). Under the first prong, the Court must determine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to the suspicion." *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006) (quotations and citation omitted). If the stop is deemed proper, the Court must then "determine whether the degree of intrusion . . . was reasonably related in scope to the situation at hand." *Id.* (quotations and citation omitted).

To determine the first factor – whether the stop was supported by reasonable suspicion – the Court must examine the "totality of the circumstances." *United States v. Arvizu,* 534 U.S. 266, 273 (2002). In doing so, the Court must consider whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each factor, by itself, is entirely consistent with innocent behavior. *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *see also United States v. Luqman*, 522 F.3d 613, 616 (6th Cir. 2008) (explaining that while the defendant "can create any number of possible innocent explanations for [his] actions, . . . the question is whether, when looking at the facts in total, the officers had reason to believe that criminal activity was afoot.") This method "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (quotations and citation omitted).

When defendant was seized, Officer Downs had the following information: defendant and the man in the red t-shirt were talking and looking around in an area notorious for violent crime and drug transactions related to gang activity. In addition, it was New's Years Eve and

8

previous experience had taught police that gun activity increased in the area on New Year's Eve. Defendant was wearing coveralls which could easily conceal contraband. The two men had "come together" in a manner that suggested an exchange had taken place. When she had approached the defendant to talk to him, he ran and continued to run as she chased him approximately 300 yards through the area. While Downs was chasing defendant, she saw him clutching at and then reaching into his coveralls at waist high level which made her think he might have a gun. These factors when considered individually are not sufficient to justify a *Terry* stop; however, when considering the totality of the circumstances, Downs had a reasonable and articulable basis to believe defendant had just been involved in a crime, specifically, a drug transaction. In fact, two factors alone, defendant's flight and his presence in a high crime area known for drug trafficking and gang violence was enough to support reasonable suspicion that criminal activity was afoot. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (defendant's "unprovoked flight" upon observing police in an area of heavy narcotics trafficking was enough to provide reasonable suspicion to conduct a *Terry* stop.) As the Supreme Court explained in *Wardlow*, "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* Similarly relevant is an officer's observation of "hand movements consistent with drug-dealing activity," *United States v. Paulette*, 457 F.3d 601, 606 (6th Cir. 2006); another factor present in this case. Finally, based on the manner in which defendant was clutching at his coveralls and given that drug dealers often carry guns and it was New Year's Eve, a night of increased gun activity, Downs had a reasonable and articulable basis to believe that defendant might be carrying a weapon.

9

Defendant attempts to compare his case favorably to *United States v. Johnson*, 620 F.3d 685 (6th Cir. 2010). In *Johnson,* police dispatch received a 911 call at 4 a.m. reporting that "some people" connected with a blue Cadillac were outside walking around the caller's apartment. Police arrived at the apartment building where a blue Cadillac was parked on the street and saw defendant Maurice Johnson carrying a bag and walking at a normal pace toward a white car also parked on the street. The officers ordered Johnson to stop but he proceeded at the same pace to walk around the front of the car, open the car door, and place the bag inside the car. Johnson then stood by the car but did not raise his hands as ordered to do so until police drew their weapons. A search of Johnson revealed a gun and drug contraband. The Sixth Circuit held police lacked reasonable suspicion to detain Johnson, and suppression of the evidence was appropriate. *Id.* at 693-96. The Sixth Circuit noted that the caller gave no description of the people walking around outside and made no allegations of criminal activity. *Id.* at 693. Further, the Court of Appeals disagreed with the trial court's conclusion that Johnson's "continuing to walk to the awaiting white car after being instructed to stop and throwing his bag into the car could indicate flight and does indicate evasive behavior." *Id.* at 694 (internal quotations omitted). In contrast, in the instant case, defendant engaged in "headlong flight" in a high crime area. *Wardlow* controls, and I conclude defendant was lawfully detained by police when he submitted to Downs' demands that he stop running.

Immediately after defendant was placed on the ground and cuffed, police asked him if he had anything on him. He responded he had marijuana and crack cocaine. Statements made by a suspect while under arrest or its functional equivalent must be preceded by *Miranda* warnings in order for those statements to be admissible. *Dickerson v. United States*, 530 U.S. 428 (2000); *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977); *United States v. Crowder*, 62 F.3d 782, 785

10

(6th Cir. 1995). On the other hand, when a person is not under arrest but is nonetheless subject to an investigative stop pursuant to *Terry v. Ohio*, he is not entitled to *Miranda* warnings even though police engage in limited questioning. *United States v. Swanson,* 341 F.3d 524, 528–29 (6th Cir.2003); *United States v. Thomas*, 142 Fed.Appx. 896, 900-01 (6th Cir. 2005).

It is defendant's contention that when he was placed on the ground and cuffed by police, he was under arrest and thus was entitled to *Miranda* warnings. Indeed, Officer Downs testified at the suppression hearing that when she and the other officers placed defendant on the ground and cuffed him, defendant was "in custody." However, the undersigned does not think Officer Downs intended to use the phrase, "in custody" as a legal term of art meaning defendant was under arrest. She simply meant he was detained, he was not free to leave. And, as previously stated, if defendant was detained for investigative purposes at that point, no *Miranda* warnings were required to ask defendant if he "had anything on him."

"When police actions go beyond checking out the suspicious circumstances that led to the original stop, the detention becomes an arrest that must be supported by probable cause." *United States v. Butler*, 223 F.3d 368, 374 (6th Cir. 2000) (quoting *United States v. Obasa*, 15 F.3d 603, 608 (6th Cir. 1994)). Involuntary removal to a police station for interrogation purposes is the traditional "line" wherein a *Terry* stop becomes a *de facto* arrest:

> There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. *Dunaway,* [442 U.S.] at 212 [2256]; *Florida v. Royer*, 460 U.S. 491, 499 [103 S.Ct. 1319, 1325, 75 L.Ed.2d 229] (1983) (plurality opinion). And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.

11

*Obasa*, 15 F.3d at 608 (internal brackets original) (footnote omitted) (quoting *Hayes v. Florida*, 470 U.S. 811, 815-16 (1985)); *Butler*, 223 F.3d at 374 (same). The use or display of force when making a *Terry* stop does not automatically turn the stop into an arrest. *See, e.g., United States v. Hardnett*, 804 F.2d 353 (6th Cir. 1986)(officers ordering suspects out of a vehicle at gunpoint did not exceed bounds of permissible *Terry* stop), *cert. denied,* 479 U.S. 1097 (1987); *United States v. Garza* (10 F.3d 1241 (6th Cir. 1993) (same).

In the instant case, when defendant was asked if he had anything on him, he had been detained only a moment and police were in the very initial stages of their investigation. I therefore conclude that while he was detained for Fourth Amendment purposes, he was not under arrest at this point and *Miranda* warnings were not required.

Once defendant told police he had marijuana and crack cocaine on his person, probable cause existed to arrest him, and thus the search which revealed the drugs was a permissible search incident to arrest. *United States v. Seymour*, 739 F.3d 923, 928 (6th Cir. 2014) ("Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed") (citing *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir.2008)); *United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir. 2004) ("Under the 'search-incident-to-a-lawful-arrest' exception to the warrant requirement, a law enforcement officer may conduct a full search of an arrestee's person incident to a lawful custodial arrest.") (citing *United States v. Robinson*, 414 U.S. 218, 234–35 (1973)).

After defendant had been given his *Miranda* warnings, he was placed in the patrol car for transportation to the police station. At this point, he voluntarily waived his right under the Fifth Amendment to remain silent and made statements to the effect that the gun officers had found

12

belonged to him; thus these statements are admissible.[2] *Miranda v. Arizona*, 384 U.S. 436 (1966); *United States v. Nichols*, 512 F.3d 789, 798 (6th Cir.2008) (in order for a defendant's statements during a custodial interrogation to be admissible, the government must demonstrate by a preponderance of the evidence that the defendant waived his Miranda rights prior to questioning), *overruled on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009); *see also United States v. Black*, 240 Fed.Appx. 95, 103 (6th Cir. 2007) (voluntarily made incriminating statements given after arrest were admissible where they were made following administration of *Miranda* warnings).

## IV. Conclusion

For the reasons stated herein, the undersigned finds defendant's detention and subsequent search on December 31, 2013 met constitutional muster, and it is RECOMMENDED [3] his motion to suppress be DENIED.

S /*William B. Mitchell Carter*
UNITED STATES MAGISTRATE JUDGE

---

[2] The undersigned notes that defendant does not argue he was not given his *Miranda* warnings before he made these statements in the patrol car or that he did not voluntarily and knowingly waive them; rather, his argument is that he was illegally detained and his statements should be suppressed as fruit of the poisonous tree.

[3] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).